## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| YATES CONSTRUCTION CO., INC., ) <br> on behalf of itself and all others ) <br> similarly situated, ) <br> ) <br>         Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> SIGMA CORPORATION, ) <br> MCWANE, INC. and STAR PIPE ) <br> PRODUCTS, LTD., ) <br> ) <br>         Defendants. ) <br> _____) | No. <br><br> CLASS ACTION COMPLAINT FOR DAMAGES <br><br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff, Yates Construction Co., Inc. ("Plaintiff"), on behalf of itself and all other similarly-situated indirect purchasers, demands trial by jury of all claims properly triable thereby against Defendants named herein, and complains and alleges, based on personal knowledge as to its own acts and on information and belief as to the acts of others, as set forth herein. The majority of evidence in support of Plaintiff's claims is in Defendants' exclusive possession, custody or control. Plaintiff's claims as to Defendants' actions are likely to have evidentiary support after a reasonable opportunity for discovery.

### NATURE OF ACTION

1.    This case arises out of an unlawful conspiracy among Defendants and their co-conspirators that had the purpose and effect of raising and fixing prices in the market for ductile iron pipe fittings ("DIPF") throughout the United States.  The conspiracy began at least as early

1

as January 11, 2008, continued among all Defendants until early 2009, and has continued among Defendants McWane, Inc. and Sigma Corp. through the present ("Class Period").

2.    DIPF are a component of pipeline systems that transport drinking water and waste water under pressurized conditions in municipal distribution systems and treatment plants.

3.    From January 2008 until early 2009, Defendants conspired to fix the prices of all DIPF sold in the United States.

4.    Defendants McWane, Inc. and Sigma Corp. then conspired to eliminate competition and restrict capacity for DIPF produced in the United States ("domestic DIPF") through adoption and enforcement of exclusive dealing policies.

5.    Plaintiff indirectly purchased domestic DIPF during the Class Period.  As a direct and proximate result of the unlawful conduct and conspiracy of Defendants alleged herein, Plaintiff and other members of the Classes (defined below) have paid more during the Class Period for DIPF than they otherwise would have paid in a competitive market and have therefore been injured in their respective businesses and property.

6.    Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and to recover damages under state antitrust and unfair competition laws, and common law principles of unjust enrichment, as well as to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of the Defendants' conspiracy to fix, raise, maintain and stabilize the prices of DIPF.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the members of each of the Classes exceed 100; the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and some members of each of the proposed Classes are citizens of a state different from some Defendants.

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 15, 22 and 26 and pursuant to 28 U.S.C. § 1391(b), (c) and (d), because, at all times relevant to the Complaint, (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of Plaintiff's claims occurred in this district; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

9.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) committed acts in this district in furtherance of the conspiracy alleged herein and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of DIPF sold to purchasers in this district; (b) transacted business in DIPF and other products in this district; (c) maintained continuous and systemic contacts with this district prior to and during the Class Period; and (d) purposefully availed itself of the benefits of doing business in this district.  Accordingly, each of the

Defendants maintains minimum contacts with this district which are more than sufficient to subject it to service of process and to comply with due process of law.

10.    Defendants' conspiracy to fix the price of DIPF has substantially affected commerce throughout the United States and in each of the states identified herein because Defendants, directly or through their agents, engaged in activities affecting each such state. Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and sale of DIPF. Defendants produced, promoted, sold, marketed, and/or distributed DIPF, thereby purposefully profiting from access to indirect-purchasers in each such state. Defendants also contracted to supply or obtain goods or revenue related to the business for DIPF. As a result of the activities described herein, Defendants have:

a.   Caused damage to the residents of every state, including the states identified herein;

b.   Caused damage in every state, including each of the states identified herein, by acts or omissions committed outside each such state by regularly doing or soliciting business in each such state;

c.   Engaged in persistent courses of conduct within every state and/or derived substantial revenue from the marketing of DIPF; and

d.   Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in every state while regularly doing or soliciting business in each such state, engaging in other persistent courses of

4

conduct in each such state, and/or deriving substantial revenue from the marketing of DIPF in each such state.

## PLAINTIFF

11.     Plaintiff Yates Construction Co., Inc. is a North Carolina corporation with its principal place of business in Stokesdale, North Carolina.  During each year of the Class Period, Plaintiff indirectly purchased domestic DIPF sold by one or more of the Defendants and was injured as a result of Defendants' illegal conduct as alleged herein.

## DEFENDANTS

12.      Defendant Sigma Corporation ("Sigma") is a corporation organized, existing and doing business under the laws of the State of New Jersey, with its principal place of business located at 700 Goldman Drive, Cream Ridge, New Jersey 08154.  Sigma imports, markets and sells DIPF throughout the United States.

13.      Defendant McWane, Inc. ("McWane") is a corporation organized, existing and doing business under the laws of the State of Delaware, with its principal place of business located at 2900 Highway 280, Suite 300, Birmingham, Alabama 35223.  McWane imports, markets and sells DIPF throughout the United States.

14.      Defendant Star Pipe Products, Ltd. ("Star Pipe") is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Texas, with its principal place of business located at 4018 Westhollow Parkway, Houston, Texas 77082.  Star Pipe imports, markets and sells DIPF throughout the United States.

**AGENTS AND CO-CONSPIRATORS**

15.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

16.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

17.     Each Defendant acted as the principal or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

**FACTUAL ALLEGATIONS**

**The DIPF Industry**

18.     DIPF are a component of pipeline systems used to transport drinking and waste water under pressurized conditions in municipal distribution systems and treatment plants. DIPF are used to join pipes, valves and hydrants in straight lines, and to change, divide or direct the flow of water.

19.     Independent wholesale distributors, known as "waterworks distributors," are the primary channel of distribution of DIPF to end users. Waterworks distributors specialize in distributing products for water infrastructure projects, and generally handle the full spectrum of waterworks products, including pipes, DIPF, valves and hydrants.

**The Relevant Market**

20.     The relevant product markets in which to evaluate Defendants' conduct are:

        a.   marketing and sale of DIPF in the United States, and

    b.  marketing and sale of domestic DIPF in the United States.

21.     Each and every state within the United States is also a relevant geographic market.

### The Conspiracy

22.     Beginning at least as early as January 11, 2008, Defendants conspired to raise and stabilize the prices at which DIPF were sold in the United States.

23.     Due to rising input costs, all Defendants desired price increases in 2008. However, McWane was concerned that Sigma and Star Pipe would not adhere to announced price increases, which would result in lost sales for McWane.  Defendants worked together throughout 2008 to alleviate McWane's concerns, with the common purpose of clearing the way for McWane to support common price increases.

24.     In January 2008, McWane formulated a plan to trade its support for higher prices in exchange for specific changes to the business methods of Sigma and Star Pipe that would reduce the risk that local sales personnel for these competitors would sell DIPF at prices lower than published levels.

25.     McWane communicated the terms of its plan to Sigma and Star Pipe. Sigma and Star Pipe manifested their understanding and acceptance of McWane's offer by taking steps to limit their discounting from published price levels in order to induce McWane to support higher price levels.

26.     On January 11, 2008, McWane announced a DIPF price increase.  Sigma and Star Pipe followed McWane's price increase.

27.     On or about March 10, 2008, McWane and Sigma executives discussed by telephone their implementation of the January 2008 price increase.

28.     In June 2008, McWane formulated a plan to trade its support for higher prices in exchange for information from Sigma and Star Pipe documenting the volume of their monthly sales of DIPF. This exchange of information was to be achieved under the auspices of an entity entitled the Ductile Iron Fittings Research Association ("DIFRA").

29.     McWane communicated the terms of its plan to Sigma and Star Pipe through a letter sent by McWane to waterworks distributors, the common customers of the Sellers. A section of that letter was meaningless to distributors, but was intended to inform Sigma and Star Pipe of the terms of McWane's offer.

30.     Sigma and Star Pipe manifested their understanding and acceptance of McWane's offer by initiating their participation in the DIFRA information exchange in order to induce McWane to support higher price levels.

31.     On June 17, 2008, McWane then led a price increase, and Sigma and Star Pipe followed.

32.     On August 22, 2008, McWane and Sigma discussed by telephone their implementation of the June 2008 price increase.

### DIFRA Facilitated Price Coordination

33.     The DIFRA information exchange operated as follows. Defendants submitted a report of their previous month's sales to an accounting firm. Shipments were reported in tons shipped, subdivided by diameter size range (e.g., 2-12") and by joint type. Data submissions were aggregated and distributed to the Defendants. Data submitted to the accounting firm was

8

typically no older than 45 days, and the summary reports returned to the Defendants contained data typically no more than 2 months old.

34.     During the period of its operation between June 2008 and January 2009, the DIFRA information exchange enabled each of the Defendants to determine and monitor its own market share and, indirectly, the output levels of its rivals. In this way, the DIFRA information exchange facilitated price coordination among the Defendants on the pricing of DIPF.

35.     The acts and practices of Defendants, as alleged herein, had the purpose, capacity, tendency, and effect of (i) fixing, maintaining and raising prices of DIPF in the relevant DIPF markets, and (ii) facilitating collusion in the relevant DIPF markets.

<u>McWane and Sigma Conspire to Restrain Competition and<br>Constrain Domestic DIPF Capacity</u>

36.     In February 2009, Congress enacted the American Recovery and Reinvestment Act (ARRA).  The ARRA allocated over $6 billion to water infrastructure projects, on the condition that those projects used domestically-produced materials including DIPF.  This requirement is known as the "Buy American Provision."

37.     At the time of ARRA enactment, McWane was the sole supplier of a full line of domestically-produced DIPF in commonly-used sizes.

38.     In response to the ARRA, Sigma, Star Pipe and others attempted to enter the domestic DIPF market.

39.     For example, Sigma took steps to evaluate entry into the domestic DIPF market including:

        a.  Formulating an operational plan;

        b.  Arranging for an infusion of equity capital to fund domestic production;

       c.   Obtaining the approval of its board of directors for its entry plans; and

       d.   Casting prototype product.

40.     McWane recognized that Sigma was preparing to enter the domestic DIPF market.  McWane sought to avoid competition from Sigma by inducing Sigma to become a distributor of McWane's domestic DIPF.

41.     McWane and Sigma reached agreement to foreclose Sigma from entering the domestic DIPF market as a competitor.  McWane and Sigma executed a Master Distribution Agreement dated September 17, 2009 ("MDA"). The principal terms of the MDA were as follows:

       a.   McWane would sell domestic DIPF to Sigma at a 20 percent discount off of McWane's published prices;

       b.   McWane would be Sigma's exclusive source for the relevant domestic DIPF;

       c.   Sigma would resell McWane's domestic DIPF at or very near McWane's published prices for domestic DIPF; and

       d.   Sigma would resell McWane's domestic DIPF to waterworks distributors only on the condition that the distributor agreed to purchase domestic DIPF exclusively from McWane or Sigma.

42.     An unwritten term of the MDA was that McWane would also sell its domestic DIPF at or very near its published prices.

43.     In the absence of a sufficiently profitable arrangement with McWane, Sigma would likely have entered the relevant domestic DIPF market in competition with McWane.

44.     Under the MDA, McWane controlled the price at which Sigma could sell domestic DIPF and the customers to whom Sigma could sell domestic DIPF.

45.     Sigma's participation in the relevant domestic DIPF market under the MDA was not equivalent to, and for consumers not a substitute for, Sigma's competitive entry into the domestic DIPF market.

46.     Sigma's independent, competitive entry into the domestic DIPF market would likely have benefitted consumers by increasing competition and DIPF supply, thereby constraining McWane's prices for the relevant domestic DIPF.

47.     Through the MDA, McWane transferred a share of its sales and profits in the domestic DIPF market to Sigma in exchange for Sigma's commitment to abandon its plans to enter the relevant domestic DIPF market as an independent competitor.

48.     Both McWane and Sigma entered into the MDA with the specific intent to maintain artificially inflated prices in the domestic DIPF market by eliminating competition among themselves and excluding their rivals.

## McWane Enforced Exclusive Distribution Policies

49.     In June 2009, Star Pipe entered the domestic DIPF market.

50.     McWane responded to Star's entry by adopting restrictive and exclusive distribution policies.  Specifically:

> a.   McWane threatened waterworks distributors with delayed or diminished access to McWane's domestic DIPF, and the loss of accrued rebates on the purchase of McWane's domestic DIPF, if those distributors purchased domestic DIPF from Star.

b.  McWane threatened some waterworks distributors with the loss of rebates in other product categories, including ductile iron pipe, waterworks valves and hydrants if those distributors purchased domestic DIPF from Star.

c.  Beginning in 2011, McWane modified its rebate structure for domestic DIPF to require waterworks distributors to make certain minimum – and high – shares of their total domestic DIPF purchases from McWane, with those minimums being high, in order to qualify for these rebates.

51.    As part of its MDA with McWane, Sigma agreed to implement an exclusive distribution policy.

52.    The purpose and effect of McWane's exclusive dealing policies, as joined by Sigma, is to compel the majority of waterworks distributors to deal with McWane and Sigma on an exclusive or nearly exclusive basis for their domestic DIPF business.

53.    The exclusive distribution policies have proved effective:  Waterworks distributors interested in purchasing domestic DIPF from Star Pipe were and are unwilling to do so under the terms of the exclusive dealing policies and have therefore remained exclusive or nearly exclusive purchasers from McWane and Sigma.

54.    The exclusive distribution policies have foreclosed Star Pipe from a substantial volume of sales opportunities with waterworks distributors.

55.     As a result of the constraints on competition effected by the exclusive distribution policies, prices of domestic DIPF have remained artificially inflated.

56.     The exclusive distribution policies have also raised barriers to entry into the domestic DIPF market by other potential entrants.  This conduct has limited competition in the market and further reduced DIPF supply, resulting in increased prices.

**Federal Trade Commission Complaints and Sigma Consent Agreement**

57.     Defendants' conspiracy was revealed on January 4, 2012, when the United States Federal Trade Commission ("FTC"), following an investigation, filed complaints against the Defendants concerning their anticompetitive conduct.  The FTC complaints document Defendants' illegal inflation of DIPF prices beginning in January 2008.

58.     Defendant Sigma has entered into a Consent Agreement with the FTC concerning the allegations set forth in the FTC complaint.  Pursuant to the Consent Agreement, Sigma has agreed to refrain from participating in or maintaining any combination or conspiracy between any competitors to fix, raise or stabilize the prices at which DIPF are sold in the United States, or to allocate or divide markets, customers, or business opportunities.

**Market Factors Supporting Conspiracy**

59.     The relevant DIPF markets have several features that facilitate collusion among Defendants, including product homogeneity, market concentration of DIPF suppliers, barriers to timely entry of new DIPF suppliers, inelastic demand at competitive prices, and uniform published prices.

60.     DIPF are commodity products produced to industry-wide standards. Product homogeneity enhances Defendants' ability to collude on prices and to detect deviations from those collusive prices.

61.     The relevant DIPF market is highly concentrated. In 2008, Defendants collectively made more than 90 percent of sales in the relevant DIPF markets. A highly concentrated market enhances Defendants' ability and incentive to collude on prices.

62.     The DIPF market is subject to significant barriers to entry, including the need for a new entrant to develop a distribution network and a reputation for quality and service with waterworks distributors and end users. Convincing end users to allow the use of a new entrant's DIPF is often a time consuming process.

63.     Demand for DIPF is inelastic to changes in price at competitive levels. DIPF are a relatively small portion of the cost of materials of a typical waterworks project, and there are no widely used substitutes for the product.

64.     Defendants publish nearly identical price books listing per-unit prices for each unique DIPF item carried by a given supplier, and periodically publish uniform multiplier discounts at which they offer to sell DIPF on a state-by-state basis. By simplifying and standardizing published prices, the DIPF price list/multiplier format enhances the Sellers' ability to collude on prices and to detect deviations from those collusive prices.

**PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY**

65.     Defendants' price-fixing conspiracy had the following effects, among others:

    a.  Price competition has been restrained or eliminated with respect to DIPF;

    b.  The prices of DIPF have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

    c.  Indirect purchasers of DIPF have been deprived of free and open competition.

66.     During the Class Period, Plaintiff and the members of the Classes have paid supra-competitive prices for DIPF.

67.     DIPF follow a traceable physical chain of distribution from the Defendants to waterworks distributors to Plaintiff and the members of the Classes.  Tracing can help show that changes in the prices paid by direct purchasers of DIPF affect prices paid by indirect-purchasers of DIPF.

68.     The inflated prices of DIPF resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other Class members by Defendants and waterworks distributors.

69.     By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for DIPF than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

70.     Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein prior to its disclosure on January 4, 2012 as a result of the FTC investigation.

71.     Since the start of the Class Period, Defendants and their co-conspirators have committed continuing violations of the antitrust and unfair competition laws resulting in monetary injury to Plaintiff and Class members.  These violations each constituted injurious acts.

72.     In addition, the illegal agreement, understanding and conspiracy of Defendants and their co-conspirators was kept secret.  As a result, Plaintiff and Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for DIPF in the United States throughout the Class Period.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

73.     Plaintiff and Class members did not discover, nor could they have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust and unfair competition laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

74.     Neither Defendants nor their co-conspirators told Plaintiff or Class members that they were fixing prices, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, the conspiracy by Defendants and their co-conspirators was inherently self-concealing.

75.     Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy that they affirmatively concealed by, *inter alia*,

a. Communicating in secret (and even going so far as to conceal the terms of the plan in a letter to waterworks distributors) to discuss prices, customers, and markets of DIPF in the United States;

b. Using DIFRA to exchange information regarding sales and pricing; and

c. Sending communications in a manner or taking actions in a manner designed to hide the origin or purpose of the communication or action.

16

76.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until January 2012, when reports of the investigations into anti-competitive conduct concerning DIPF were first publicly disseminated.

77.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the members of the Classes have alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities that, during the Class Period, purchased domestic DIPF indirectly from Defendants and/or their co-conspirators. Excluded from the Class are Defendants, their co-conspirators and their officers, employees, agents, representatives, parents, subsidiaries and affiliates.

79.     Plaintiff also brings this action on behalf of  itself as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition and common laws on behalf of the following class (the "Damages Class"):

> All persons and entities that, during the Class Period, purchased domestic DIPF indirectly from Defendants and/or their co-conspirators, or, from January 11, 2008 through January 2009, purchased non-domestic DIPF indirectly from Defendants and/or their co-conspirators, in the following states:  Arizona, California, District

17

of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  Excluded from the Class are Defendants, their co-conspirators and their officers, employees, agents, representatives, parents, subsidiaries and affiliates.

80.     Plaintiff reserves the right to amend the Class definitions prior to certification.

81.     Plaintiffs do not know the exact size of the Classes. However, due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed across the United States such that joinder is impracticable.

82.     Class members are identifiable from information and records in their possession.

83.     There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, the conduct of the Defendants in agreeing to participate and participating in the conspiracy, and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

     a.     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the price charged for DIPF sold in the United States;

     b.     The identity of participants in the conspiracy;

     c.     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

     d.     Whether Defendants took steps to actively conceal the conspiracy from Plaintiff and other Class members;

18

e.      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

f.      Whether the alleged conspiracy violated state antitrust and unfair competition law, as alleged in the Second and Third Claims for Relief;

g.      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

h.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

i.      The effect of Defendants' conspiracy on the prices of DIPF sold by Defendants during the Class Period; and

j.      The appropriate measure of damages sustained by Plaintiff and other members of the Damages Class.

84.      Plaintiff's claims are typical of the claims of other members of the Classes, and Plaintiff will fairly and adequately protect the interests of those Classes.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes.  Plaintiff has retained competent counsel experienced in the prosecution of antitrust class action litigation.

85.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

87.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by members of the Class that otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

88.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of, interstate trade and commerce of the United States, in that, *inter alia*:

    a.   Defendants and their co-conspirators have sold DIPF throughout the United States;

    b.   Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell DIPF throughout the United States;

    c.   In furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate

20

wire communications and via U.S. mail; and

d.   The conspiracy alleged herein has affected millions of dollars of

commerce. Defendants and their co-conspirators have inflicted antitrust

injury by artificially raising prices paid by Plaintiffs and other entities who

are themselves engaged in commerce.

**<u>VIOLATIONS ALLEGED</u>**

**<u>First Claim For Relief</u>**

**(Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)**

**(On behalf of Plaintiff and the Nationwide Class)**

**(As against McWane and Sigma)**

89.     Plaintiff incorporates by reference as if fully set forth herein the allegations

contained in the preceding paragraphs of this Complaint.

90.     Beginning in or about September 2009, Defendants McWane and Sigma and their

co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint

of trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the

Clayton Act, 15 U.S.C. § 15.

91.     In furtherance of the unlawful conspiracy, Defendants McWane and Sigma and

their co-conspirators have committed overt acts, including, *inter alia*:

a.   Entering into a distribution agreement that eliminated Sigma as an entrant

into the domestic DIPF market;

b.   Excluding actual and potential competitors through the adoption and

enforcement of exclusive distribution policies;

c.   Agreeing to charge prices at certain levels and otherwise to fix, increase,

maintain and/or stabilize prices of DIPF sold in the United States;

    d.   Participating in conversations and communications regarding prices to be charged for DIPF; and

    e.   Keeping the existence of the conspiracy unknown in order to foster the illegal anti-competitive conduct described herein.

92.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.   Price competition in the sale of DIPF has been restrained, suppressed, and/or eliminated;

    b.   Prices for DIPF have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels; and

    c.   Plaintiff and members of the Class have been deprived of the benefits of free and open competition.

93.    Defendants McWane and Sigma and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of DIPF.

94.    As a direct and proximate result of the illegal agreement, contract, combination trust, and/or conspiracy between Defendants McWane and Sigma, Plaintiff and the members of the Class have been injured and damaged in their respective businesses and property.

95.    The conduct of Defendants McWane and Sigma and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

96.     Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants McWane and Sigma, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

### Violation of State Antitrust Statutes

### (On behalf of Plaintiff and the Damages Class)

### (As against all Defendants)

97.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

98.     From at least as early as January 11, 2008 until at least April 2009, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of DIPF in unreasonable restraint of trade and commerce and in violation of the various state statutes set forth below.

99.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain, at artificially supra-competitive levels, prices for DIPF in the United States.

100.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    a.  participating in conversations and communications among themselves during which they agreed to price DIPF at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to DIPF sold in the United States; and

    b.  participating in conversations and communications among themselves to implement, adhere to and police the unlawful agreements they reached.

23

101.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain or stabilize prices and to allocate customers with respect to DIPF.

102.    Defendants' anti-competitive acts described above constitute violations of the state statutes that follow.

103.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

104.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

105.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated, §§ 28-4501, *et seq*.

106.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

107.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated, §§ 480-1, *et seq*.

108.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.

109.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code, §§ 553.1, *et seq*.

110.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

111.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq*.

112.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan compiled Law Annotated, §§ 445.771, *et seq*.

113.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes, §§ 325D.49, *et seq*.

114.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated, §§ 75-21-1, *et seq*.

115.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*.

116.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes, §§ 59-801, *et seq*.

117.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated, §§ 598A.010, *et seq*.

118.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes, §§ 356:1, *et seq*.

119.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated, §§ 57-1-1, *et seq*.

120.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws, § 340, *et seq*.

121.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes, §§ 75-1, *et seq.*

122.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code, §§ 51-08.1-01, *et seq.*

123.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes, §§ 646.705, *et seq.*

124.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina's Unfair Trade Practices Act, S.C. Code Ann., §§ 39-5-10, *et seq.*

125.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws, §§ 37-1-3.1, *et seq.*

126.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated, §§ 47-25-101, *et seq.*

127.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated, §§ 76-10-911, *et seq.*

128.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

129.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code, §§ 47-18-1, *et seq.*

130.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes, §§ 133.01, *et seq.*

131.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract,

26

conspiracy and agreement.  Plaintiff and members of the Damages Class have paid more for

DIPF than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This

injury is of the type the laws of the above states were designed to prevent and flows from that

which makes Defendants' conduct unlawful.

132.     In addition, Defendants have profited significantly from the aforesaid conspiracy.

Defendants' profits derived from their anti-competitive conduct come at the expense and

detriment of members of the Plaintiff and the members of the Damages Class.

133.     Accordingly, Plaintiff and the members of the Damages Class in each of the

above jurisdictions seek damages (including statutory damages where applicable), to be trebled

or otherwise increased as permitted by a particular jurisdiction's applicable law, and costs of suit,

including reasonable attorneys' fees, to the extent permitted by the above state laws.

<u>**THIRD CLAIM FOR RELIEF**</u>

**Violation of State Antitrust Statutes**

**(On behalf of Plaintiff and the Damages Class)**

**(As against McWane and Sigma)**

134.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

135.     From at least as early as September 17, 2009, McWane and Sigma engaged in a

continuing contract, combination, or conspiracy with respect to the sale of domestic DIPF in

unreasonable restraint of trade and commerce and in violation of the various state statutes set

forth below.

136.     The contract, combination, or conspiracy consisted of an agreement among

McWane and Sigma and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at

artificially supra-competitive prices for domestic DIPF in the United States.

137.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    a.   participating in conversations and communications among themselves during which they agreed to price domestic DIPF at certain levels; sell domestic DIPF under certain restrictive and anti-competitive terms; restrict capacity of domestic DIPF; and otherwise fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to domestic DIPF sold in the United States; and

    b.   participating in conversations and communications among themselves to implement, adhere to and police the unlawful agreements they reached.

138.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain or stabilize prices and to allocate customers with respect to DIPF.

139.    Defendants' anti-competitive acts described above constitute violations of the state statutes that follow.

140.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

141.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

142.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated, §§ 28-4501, *et seq*.

143.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

144.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated, §§ 480-1, *et seq*.

145.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.

146.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code, §§ 553.1, *et seq*.

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

148.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq*.

149.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan compiled Law Annotated, §§ 445.771, *et seq*.

150.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes, §§ 325D.49, *et seq*.

151.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated, §§ 75-21-1, *et seq*.

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*.

153.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes, §§ 59-801, *et seq*.

154.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated, §§ 598A.010, *et seq*.

155.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes, §§ 356:1, *et seq*.

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated, §§ 57-1-1, *et seq*.

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws, § 340, *et seq*.

158.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes, §§ 75-1, *et seq*.

159.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code, §§ 51-08.1-01, *et seq*.

160.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes, §§ 646.705, *et seq*.

161.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina's Unfair Trade Practices Act, S.C. Code Ann., §§ 39-5-10, *et seq*.

162.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws, §§ 37-1-3.1, *et seq*.

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated, §§ 47-25-101, *et seq*.

164.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated, §§ 76-10-911, *et seq.*

165.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

166.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code, §§ 47-18-1, *et seq.*

167.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes, §§ 133.01, *et seq.*

168.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiff and members of the Damages Class have paid more for DIPF than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

169.    In addition, Defendants McWane and Sigma have profited significantly from the aforesaid conspiracy.  Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of members of the Plaintiff and the members of the Damages Class.

170.    Accordingly, Plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's applicable  law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### (On behalf of Plaintiff and the Damages Class)

### (As against all Defendants)

171.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

172.    As a result of their unlawful conduct described above, Defendants have been unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of DIPF.

173.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or the members of the Damages Class for DIPF.

174.    Plaintiff and the member of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

Accordingly, Plaintiff respectfully requests that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes, that Plaintiff be appointed as Class representative, and that Plaintiff's counsel be appointed Interim Lead Counsel for the Classes.

32

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)      An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)      A *per se* violation of Section 1 of the Sherman Act;

(c)      An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition laws as set forth herein; and

(d)      Acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants McWane and Sigma, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other person acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and form adopting or following any practice, plan, program or device having a similar purpose or effect;

33

F.      Plaintiff and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorney's fees, as provided by law; and

I.      Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


DATED: January 10, 2012          By:      /s/ Lisa J. Rodriguez
                                          Lisa J. Rodriguez
                                          TRUJILLO RODRIGUEZ & RICHARDS, LLC
                                          258 Kings Highway, East
                                          Haddonfield NJ, 08033
                                          (856)795-9002
                                          (856)795-9887 (fax)
                                          Email: lisa@trrlaw.com


                                          Steven A. Asher, Esquire
                                          Mindee J. Reuben, Esquire
                                          Jeremy S. Spiegel, Esquire
                                          WEINSTEIN KITCHENOFF & ASHER LLC
                                          1845 Walnut Street, Suite 1100
                                          Philadelphia, PA 19103
                                          Telephone (215) 545-7200
                                          Fax (215) 545-6535
                                          Email: asher@wka-law.com
                                                 reuben@wka-law.com
                                                 spiegel@wka-law.com