NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Ductile Iron Pipe Fittings ("DIPF") Indirect Purchaser Antitrust Litigation | Civ. No. 12-169 OPINION |

THOMPSON, U.S.D.J.

## I.  INTRODUCTION

This matter has come before the Court upon four motions to dismiss in this consolidated

action.  Defendants McWane, Inc. ("McWane") and Sigma Corporation ("Sigma") filed a

Motion to Dismiss in both *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust

Litigation* ("IPP Action"), (IPP Action, Docket Entry No. 117), and *State of Indiana v. McWane,

Inc.* ("Indiana Action"), (Indiana Action, Docket Entry No. 29), two cases that were consolidated

by this Court on June 27, 2012, (Indiana Action, Docket Entry No. 31).  Star Pipe Products, Ltd.

("Star Pipe Products") filed a Motion to Dismiss Counts Three, Four, and Eight of the Second

Amended Complaint in the IPP Action, (IPP Action, Docket Entry No. 116), and a Motion to

Dismiss Count Three of the Amended Complaint in the Indiana Action, (Indiana Action, Docket

Entry No. 28).  Waterline Industries Corporation & Waterline Services, LLC ("Waterline"),

Yates Construction Co., Inc. ("Yates"), City of Hallandale Beach ("Hallandale Beach"), City of

Blair ("Blair"), Wayne County ("Wayne"), South Huntingdon Water District ("South

Huntingdon"), Village of Woodbridge ("Woodbridge"), Town of Fallsburg ("Fallsburg"), City of

Fargo ("Fargo"), and Water District No. 1 of Johnson County ("Johnson County") (collectively, "Indirect Purchaser Plaintiffs") oppose the motions filed in the IPP Action, (IPP Action, Docket Entry No. 122), and the State of Indiana ("Indiana") opposes the motions filed in the Indiana Action, (Indiana Action, Docket Entry No. 120). The Court has decided these matters upon consideration of the parties' written submissions and without oral argument, pursuant to Federal Rule of Civil Procedure 78(b). For the reasons given below, Defendants' motions to dismiss are granted in part and denied in part.

## II.  BACKGROUND

This case concerns antitrust violations allegedly committed by manufacturers and distributors of ductile iron pipe fittings ("DIPF"). Indirect Purchaser Plaintiffs bring on behalf of themselves and all other similarly-situated indirect purchasers eight claims for relief. (IPP Action, Docket Entry No. 110). They seek injunctive relief for alleged violations of Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act, as well as damages for violations of numerous state antitrust, consumer protection, and unfair competition statutes. (IPP Action, Docket Entry No. 110). Indirect Purchaser Plaintiffs also seek relief for unjust enrichment. (*Id.*). Indiana similarly seeks injunctive relief for alleged violations of Sections 1 and 2 of the Sherman Act, and Section 16 of the Clayton Act, as well as damages for violations of Indiana state law. (Indiana Action, Docket Entry No. 22).

Defendants now seek to have the second amended complaint from the IPP Action ("IPP Complaint") and the amended complaint from the Indiana Action ("Indiana Complaint") dismissed under Rule 12(b)(6). Although Indirect Purchaser Plaintiffs and Indiana filed separate complaints, the Court analyzes them together for the purposes of this motion and considers as

2

true all of Indirect Purchaser Plaintiffs' and Indiana's well-pleaded factual allegations.[1]  *See*

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

A. *DIPF Industry*

DIPF are used to join pipes, valves, and hydrants in pipeline systems that transport waste and drinking water in municipal distribution systems and treatment plants.  Defendants import, market, and sell DIPF throughout the United States to independent wholesale distributors ("waterworks distributors") who then sell DIPF to end users.  Indirect Purchaser Plaintiffs and Indiana, acting on behalf of itself and Indiana subdivisions, allege that they indirectly purchased DIPF from Defendants in this manner and paid inflated prices for it as a result of a number of anticompetitive schemes perpetuated by Defendants.

B. *The Alleged Anticompetitive Schemes*

Indirect Purchaser Plaintiffs and Indiana allege two anticompetitive schemes.  The first anticompetitive scheme involves allegations that McWane, Star Pipe Products, and Sigma "conspired to raise and stabilize the prices at which DIPF were sold in the United States from January 11, 2008 through May 2009."  (IPP Action, Docket Entry No. 110 at ¶ 54; Indiana Action, Docket Entry No. 22 at ¶ 41).  Indirect Purchaser Plaintiffs and Indiana allege that McWane developed a plan in December 2007 to trade its support for higher prices in exchange for specific changes to the business methods of Sigma and Star Pipe Products.  (IPP Action, Docket Entry No. 110 at ¶ 54; Indiana Action, Docket Entry No. 22 at ¶ 42).  McWane apparently communicated this plan to Sigma and Star Pipe Products directly through various meetings and telephone calls, as well as indirectly through pricing communications to customers. (IPP Action, Docket Entry No. 110 at ¶ 56; Indiana Action, Docket Entry No. 22 at ¶ 43).

---

[1] The IPP Complaint and the Indiana Complaint contain nearly identical factual allegations.

After notifying Sigma and Star Pipe Products of its intent to raise prices in a January 11, 2008 letter to its customers, McWane increased its prices, and Sigma and Star Pipe Products followed suit soon thereafter.  (IPP Action, Docket Entry No. 110 at ¶¶ 57-63; Indiana Action, Docket Entry No. 22 at ¶¶ 44-49).  A second, similar price increase was implemented in June 2008, however, for this price increase, McWane agreed to raise prices only in exchange for information from Sigma and Star Pipe Products concerning their monthly sales volume.  (IPP Action, Docket Entry No. 110 at ¶ 64; Indiana Action, Docket Entry No. 22 at ¶¶ 50-51). According to Indirect Purchaser Plaintiffs and Indiana, Sigma and Star Pipe Products signaled their agreement to participate in the conspiracy by joining the Ductile Iron Fittings Research Association ("DIFRA"), an entity that facilitated the exchange of information about each Defendants' market share.  (IPP Action, Docket Entry No. 110 at ¶¶ 65-68; Indiana Action, Docket Entry No. 22 at ¶¶ 53, 56-57).  McWane then publicly signaled that it would raise prices and Sigma and Star Pipe Products announced similar price increases.  (IPP Action, Docket Entry No. 110 at ¶¶ 69-70; Indiana Action, Docket Entry No. 22 at ¶ 54).  In April 2009, McWane announced a new price list for DIPF.  (IPP Action, Docket Entry No. 110 at ¶ 71; Indiana Action, Docket Entry No. 22 at ¶ 58).  Following this public announcement, Star Pipe Products sought and received assurances from McWane that McWane would fully implement the price increase and then Defendants subsequently adopted the price increase.  (IPP Action, Docket Entry No. 110 at ¶¶ 72-74; Indiana Action, Docket Entry No. 22 at ¶ 59).

Finally, in one of the only material differences between the Indirect Purchaser Complaint and the Indiana Complaint, Indiana provides allegations of one additional price increase. (Indiana Action, Docket Entry No. 22 at ¶¶ 63-71).  Specifically, Indiana alleges that Defendants implemented a price increase in June 2010 through a similar process whereby Star Pipe Products

4

announced that it planned to increase prices and the remaining Defendants subsequently adopted similar price increases. (*Id*. at ¶¶ 63-70).

The second anticompetitive scheme involves allegations that McWane "was able to maintain its monopoly power in the Domestic DIPF market through [certain] unlawful acts." (IPP Action, Docket Entry No. 110 ¶ 83; Indiana Action, Docket Entry No. 22 at ¶ 79). Specifically, Indirect Purchaser Plaintiffs and Indiana allege that McWane possessed monopoly power in the Domestic DIPF market in 2009. (IPP Action, Docket Entry No. 110 at ¶ 78; Indiana Action, Docket Entry No. 22 at ¶ 75). When Congress enacted the American Recovery and Reinvestment Act ("ARRA") in February of that year, it allocated over $6 billion to water infrastructure projects and directed that the funds were to be used on projects that used only domestically-produced products, including DIPF. (IPP Action, Docket Entry No. 110 at ¶ 77; Indiana Action, Docket Entry No. 22 at ¶ 72). The passage of the ARRA left McWane poised to reap substantial profits by virtue of its monopoly in the Domestic DIPF market and created a large incentive for competitors, including Sigma and Star Pipe Products, to enter the Domestic DIPF market. (IPP Action, Docket Entry No. 110 at ¶¶ 79, 80; Indiana Action, Docket Entry No. 22 at ¶¶ 74, 76).

According to Indirect Purchaser Plaintiffs and Indiana, McWane took a number of steps to foreclose Sigma and Star Pipe Products from entering the Domestic DIPF market. First, McWane, upon realizing that Sigma was preparing to enter the Domestic DIPF market, induced Sigma to abandon its plans and to, instead, become a distributor of McWane's domestic DIPF. (IPP Action, Docket Entry No. 110 at ¶ 86; Indiana Action, Docket Entry No. 22 at ¶ 81). Specifically, McWane allegedly entered into the Master Distribution Agreement ("MDA") whereby Sigma agreed that instead of manufacturing its own DIPF products for distribution in

the Domestic DIPF market, it would purchase some of McWane's output of Domestic DIPF to resell to its distributors.  (IPP Action, Docket Entry No. 110 at ¶ 87; Indiana Action, Docket Entry No. 22 at ¶ 82).

McWane also sought to foreclose Star Pipe Products' entry to the Domestic DIPF market upon Star Pipe Products' announcement in June 2009 that it intended to begin domestic DIPF production.  (IPP Action, Docket Entry No. 110 at ¶¶ 97-98; Indiana Action, Docket Entry No. 22 at ¶ 88).  To impede and delay Star Pipe Products' entry, McWane allegedly adopted certain restrictive and exclusive distribution policies, including (1) threatening waterworks distributors with delayed or diminished access to McWane's Domestic DIPF and the loss of accrued rebates of McWane's Domestic DIPF if the distributors purchased Domestic DIPF from Star Pipe Products; (2) inducing Sigma to implement a similar distribution policy through the MDA; (3) threatening waterworks distributors with the loss of rebates in other product categories if those distributors purchased Domestic DIPF from Star Pipe Products; and (4) bundling rebates for pipes and DIPF to compel purchasers to buy DIPF from McWane in order to be eligible for substantial rebates on other pipe products.  (IPP Action, Docket Entry No. 110 at ¶¶ 99-101; Indiana Action, Docket Entry No. 22 at ¶ 89-90).

*C.  IPP Action*

On January 10, 2012, Indirect Purchaser Plaintiffs initiated this lawsuit and, after the case was consolidated with a number of similar actions, filed the first amended complaint ("First Amended Complaint") on July 11, 2012.  (*See* IPP Action, Docket Entry Nos. 1, 58, 85).  Defendants moved to dismiss the First Amended Complaint on September 26, 2012.  (IPP Action, Docket Entry Nos. 89, 90).  The Court then issued an Opinion on March 18, 2013 ("March 18 Opinion"), dismissing the First Amended Complaint because the pleadings failed to

show that the Indirect Purchaser Plaintiffs were directly injured as to each claim.  (IPP Action, Docket Entry No. 105).  Specifically, the Court determined that it was not clear whether Indirect Purchaser Plaintiffs had actually purchased the relevant type of DIPF at a time when Defendants' alleged anticompetitive schemes were in place.  (*Id*. at 7-10).  For a number of Indirect Purchaser Plaintiffs' other claims, it was not clear that any Indirect Purchaser Plaintiff had purchased DIPF from one of the Defendants charged with that particular violation.  (*Id*.).  As each of Indirect Purchaser Plaintiffs' claims was ultimately dismissed on these bases, the Court found it unnecessary to address Defendants' additional arguments in favor of dismissal.  (*Id*. at 10).  The Court, dismissing the First Amended Complaint without prejudice, encouraged Indirect Purchaser Plaintiffs "to anticipate those arguments and address any additional potential pleading deficiencies when amending the [First] Amended Complaint."  (*Id*.).

Indirect Purchaser Plaintiffs then submitted a second amended complaint, the IPP Complaint, in which they assert eight claims for relief.  (IPP Action, Docket Entry No. 110).  In Count One, Indirect Purchaser Plaintiffs seek injunctive relief from McWane and Sigma for maintaining a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act.  (*Id*. at ¶¶ 142-149).  In Count Two, they seek an injunction against McWane for maintaining an illegal monopoly in the Domestic DIPF market in violation of Section 2 of the Sherman Act and Section 3 of the Clayton Act.  (*Id*. at ¶¶ 150-54).  In Count Three, Indirect Purchaser Plaintiffs seek damages from Defendants for conspiring to unreasonably restrain trade in violation of a number of state antitrust statutes.[2]  (*Id*. at ¶¶ 155-86).  In Count Four, Indirect Purchaser Plaintiffs seek damages from Defendants for engaging in

---

[2] Specifically, Indirect Purchaser Plaintiffs assert claims under Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin state law.

unfair competition or unfair, unconscionable, deceptive, or fraudulent acts in violation of a number of state consumer protection and unfair competition statutes.[3]  (*Id*. at ¶¶ 187-203).  In Count Five, they seek damages from McWane and Sigma for unreasonably restraining trade in violation of a number of state antitrust statutes.[4]  (*Id*. at ¶¶ 204-35).  In Count Six, Indirect Purchaser Plaintiffs seek damages from McWane and Sigma for violating a number of state consumer protection and unfair competition statutes.[5]  (*Id*. at ¶¶ 236-51).  In Count Seven, Indirect Purchaser Plaintiffs seek damages from McWane for monopolization in violation of a number of state antitrust, consumer protection, and unfair competition statutes.[6]  (*Id*. at ¶¶ 252-82).  Finally, in Count Eight, Indirect Purchaser Plaintiffs seek damages from all Defendants for unjust enrichment.  (*Id*. at ¶¶ 283-86).

   D.  *Indiana Action*

       On October 23, 2012, Indiana initiated a lawsuit against Defendants as well.  (Indiana Action, Docket Entry No. 1).  On November 5, 2012, an Order that consolidated cases in the IPP Action was filed in the Indiana Action to advise the parties that the case would be consolidated with the IPP Action unless a party objected to consolidation.  (Indiana Action, Docket Entry No. 4).  On November 15, 2012, Indiana objected to consolidation.  (Indiana Action, Docket Entry No. 6).  At the request of the parties, the Court deferred decision on whether to consolidate the two cases until after a ruling was made on pending motions to dismiss in the IPP Action.

---

[3] Specifically, Indirect Purchaser Plaintiffs assert claims under Arkansas, California, Florida, Hawaii, Massachusetts, Nebraska, New Hampshire, New Mexico, North Carolina, Rhode Island, and South Carolina state law.

[4] Specifically, Indirect Purchaser Plaintiffs assert claims under Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin state law.

[5] Specifically, Indirect Purchaser Plaintiffs assert claims under Arizona, California, Florida, Hawaii, Massachusetts, Nebraska, New Hampshire, New Mexico, North Carolina, Rhode Island, and South Carolina.

[6] Specifically, Indirect Purchaser Plaintiffs assert claims under Arizona, Arkansas, District of Columbia, Florida, Hawaii, Iowa, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Utah, Vermont, West Virginia, and Wisconsin state law.

(Indiana Action, Docket Entry No. 15).  The Court also extended the time for Defendants to respond to the Indiana Complaint until after a ruling on the motions to dismiss in the IPP Action. (*Id*.).

Following the Court's dismissal of the IPP Complaint, the parties agreed to permit Indiana to file an amended complaint in conformity with the Court's ruling in the IPP Action. (Indiana Action, Docket Entry No. 18).  Then, on May 9, 2013, Indiana filed the Indiana Complaint, which asserts five claims against Defendants.  (Indiana Action, Docket Entry No. 22).  In Count One, Indiana seeks injunctive relief from McWane and Sigma for maintaining a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and Section 16 of the Clayton Act.  (*Id*. at ¶¶ 133-40).  In Count Two, Indiana seeks an injunction against McWane for maintaining an illegal monopoly in the Domestic DIPF market in violation of Section 2 of the Sherman Act and Section 16 of the Clayton Act.  (*Id*. at ¶¶ 141-45).  In Counts Three, Four, and Five, Indiana asserts claims under Indiana state law, seeking damages (1) from all Defendants for conspiring to unreasonably restrain trade; (2) from McWane and Sigma for conspiring to unreasonably restrain trade; and (3) from McWane for monopolizing the Domestic DIPF market, respectively.  (Indiana Action, Docket Entry No. 22 at ¶¶ 146-76).

### E.  *Pending Motions to Dismiss*

On June 17, 2013, Defendants moved to dismiss both the IPP Complaint and the Indiana Complaint.  (IPP Action, Docket Entry Nos. 116, 117; Indiana Action, Docket Entry Nos. 28, 29).  Shortly thereafter, the Court issued an Order consolidating the Indiana Action with the IPP Action.  (Indiana Action, Docket Entry No. 31).  The Court now considers Defendants' motions to dismiss.  For the reasons set forth below, Defendants' motions to dismiss are granted in part and denied in part.

III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that pleadings contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  On a motion to dismiss for failure to state a claim, a "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

When considering a Rule 12(b)(6) motion, a district court should conduct a three-part analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id*. (quoting *Iqbal*, 556 U.S. at 675).  Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  But, the court should disregard any conclusory allegations proffered in the complaint.  *Id*.  Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'"  *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).  This requires more than a mere allegation of an entitlement to relief.  *Id*.  "A complaint has to 'show' such an entitlement with its facts."  *Id*.  A claim is only plausible if the facts pleaded allow a court to reasonably infer that the defendant is liable for the misconduct alleged.  *Id*. at 210 (quoting *Iqbal*, 556 U.S. at 678).  Facts suggesting the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief.  *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).

IV. <u>ANALYSIS</u>

Defendants advance a number of arguments in favor of dismissal under Rule 12(b)(6). The Court addresses each argument separately.

A. *Injunctive Relief – Counts 1 & 2 of the IPP Complaint & the Indiana Complaint*

McWane and Sigma[7] argue that Indirect Purchaser Plaintiffs' and Indiana's claims for injunctive relief – Counts One and Two of the IPP Complaint and Counts One and Two of the Indiana Complaint, respectively – should be dismissed under Rule 12(b)(6).  (IPP Action, Docket Entry No. 117, Attach. 1 at 33-37; Indiana Action, Docket Entry No. 29 at 33-37).  Specifically, they argue that dismissal is appropriate because Indirect Purchaser Plaintiffs and Indiana have not alleged facts showing an ongoing or threatened harm.  (*Id.*).

A plaintiff seeking an injunction in an antitrust context must "make a showing of entitlement to injunctive relief requiring the demonstration of: (1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust violation."  *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000) (citing *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996)).  The plaintiff must show that he "is immediately in danger of sustaining some direct injury" and that the threatened injury is "real and immediate" and not "conjectural" or "hypothetical."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal citations omitted).  "Abstract injury is not enough," *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974), and "[p]ast exposure to illegal conduct does not itself show a present case or

---

[7] Neither Indirect Purchaser Plaintiffs nor Indiana asserts claims for injunctive relief against Star Pipe Products. (*See* IPP Action, Docket Entry No. 110 at ¶¶ 142-54; Indiana Action, Docket Entry No. 22 at ¶¶ 133-45).  In both the IPP Complaint and the Indiana Complaint, however, Indirect Purchaser Plaintiffs and Indiana state in the prayer for relief that they seek an injunction against all Defendants.  As a statement included in a prayer for relief is insufficient to assert a claim, *see, e.g., Soder v. Chenot*, No. 06-1522, 2007 WL 4556670, at *6 (E.D. Pa. Dec. 20, 2007), and Indirect Purchaser Plaintiffs and Indiana did not address this issue in their briefs after it was raised by Star Pipe Products, the Court concludes that Indirect Plaintiff Purchasers and Indiana have not asserted a claim for injunctive relief against Star Pipe Products.

controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (quoting *O'Shea*, 414 U.S. at 495-96).

In this case, the Court agrees with McWane and Sigma that Indirect Purchaser Plaintiffs' and Indiana's allegations are insufficient to set forth a real and immediate danger. The most recent allegations contained in the IPP Complaint concern events that occurred in September 2009, (IPP Action, Docket Entry No. 110 at ¶¶ 66-67), and the Indiana Complaint details allegations no later than June 2010, (Indiana Action, Docket Entry No. 22 at ¶¶ 63-70). In other words, aside from the conclusory statement that McWane and Sigma's anticompetitive behavior is "continuing to the present," there are no allegations to suggest ongoing violations.

Moreover, Sigma and Star Pipe Products have already entered into consent decrees with the Federal Trade Commission to abstain from engaging in the very activities that Indirect Purchaser Plaintiffs and Indiana seek to enjoin.[8] (IPP Action, Docket Entry No. 110 at ¶¶ 109, 110; Indiana Action, Docket Entry No. 22 at ¶¶ 127, 128). "Although the existence of a consent decree is not dispositive, it is relevant to the determination of whether there exists some cognizable danger of a recurrent violation." *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 17 (citing and quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *see also In re Plavix Indirect Purchaser Antitrust Litig.*, No. 06-226, 2011 WL 335034, at *4 (S.D. Ohio Jan. 31, 2011) ("While the Court agrees the existence of the permanent injunction . . . might not be dispositive [as to whether plaintiffs may pursue claims for injunctive relief], it is relevant to the determination of whether there exists some cognizable danger of recurrent violation, something

---

[8] Specifically, Indirect Purchaser Plaintiffs and Indiana seek an injunction enjoining McWane and Sigma from: (1) "[e]ntering into a distribution agreement that eliminated Sigma as an entrant into the Domestic DIPF market;" (2) [e]xcluding actual and potential competitors through the adoption and enforcement of exclusive distribution policies;" (3) "[a]greeing to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of DIPF sold in the United States;" (4) "[p]articipating in conversations and communications regarding prices to be charged for DIPF;" and (5) "[k]eeping the existence of the conspiracy unknown in order to foster the illegal anticompetitive conduct . . . ." (IPP Action, Docket Entry No. 110 at ¶¶ 144, 152; Indiana Action, Docket Entry No. 22 at ¶¶ 135, 143).

more than the mere possibility which serves to keep the case alive."). Consistent with this

principle, a number of courts have found no risk of irreparable harm when a plaintiff seeks an

injunction that mirrors a consent decree absent some showing that the consent decree is

insufficient. *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 476 (6th Cir. 2004) (finding reversible

error where district court granted an injunction without an explanation from the plaintiff as to

how the existing consent decrees fail to address plaintiff's claims for injunctive relief); *see also*

*Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 261 (1972) ("[T]he fact is that one injunction

is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one.");

*Harthman v. Witty*, 480 F.2d 337 (3d Cir. 1973) ("The defendant was permanently enjoined . . .

from further polluting [under the first injunction]. Under the circumstances a second injunction

was unnecessary and it would have been the duty of the court to refuse to grant it."); *In re*

*Nifedipine*, 335 F. Supp. 2d at 17-18 ("[T]he mere existence of the Consent Order does not

preclude private injunctive relief. Indeed, in antitrust cases, private and governmental claims for

injunctive relief were designed to be cumulative, not mutually exclusive. However, the party

seeking the injunction nonetheless has the burden of establishing that such cumulative relief is

needed."); *In re Plavix*, 2011 WL 335034, at *4 (dismissing claims for injunctive relief for

failure to establish threatened conduct that will cause loss or damage where permanent injunction

already in place). As Indirect Purchaser Plaintiffs and Indiana "have neither alleged that the

Consent Order is inadequate nor have they identified any specific conduct that should be

enjoined over and above the conduct prohibited by the Consent [Decrees]," the Court finds that

dismissal of Counts One and Two of the IPP Complaint and the Indiana Complaint is warranted.

*In re Nifedipine*, 335 F. Supp. 2d at 18.

B.  *Unjust Enrichment – Count 8 of the IPP Complaint*

Defendants argue that Indirect Purchaser Plaintiffs' unjust enrichment claim – Count Eight of the IPP Complaint – must be dismissed because Indirect Purchaser Plaintiffs fail to identify a particular state law under which they advance this claim.  (IPP Action, Docket Entry No. 116, Attach. 1 at 8-10; IPP Action, Docket Entry No. 117, Attach. 1 at 21-25).  Defendants point to a number of opinions in which federal district courts have dismissed unjust enrichment claims for failure to specify the state law under which the plaintiffs proceed.  *In re Refrigerant Compressors Antitrust Litig. ("In re Refrigerant Compressors II")*, No. 09-2042, 2013 WL 1431756, at *23 (E.D. Mich. Apr. 9, 2013); *In re TFT-LC (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1124 (N.D. Cal. Aug. 25, 2008); *In re Static Random Access Memory Antitrust Litig.*, 580 F. Supp. 2d 896, 910 (N.D. Cal. Feb. 14, 2008); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1379 (S.D. Fla. July 2, 2001); *In re Flonase Antitrust Litig. ("In re Flonase I")*, 610 F. Supp. 2d 409, 419 (E.D. Pa. Apr. 15, 2009); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 587 (M.D. Pa. Mar. 4, 2009); *In re Auto. Parts Antitrust Litig.*, MDL No. 12-2311, 2013 WL 2456612, at *31 (E.D. Mich. June 6, 2013).

Indirect Purchaser Plaintiffs urge the Court to disregard those cases cited by Defendants.  (Docket Entry No. 122, Attach. 1 at 35-38).  They argue that the law of unjust enrichment does not vary materially from state to state and point to several cases that compare unjust enrichment claims under the laws of various states and find few material differences.  *See, e.g., In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. Apr. 24, 2009), *opinion modified on reconsideration on other grounds*, MDL No. 1914, 2010 WL 2976496 (D.N.J. July 22, 2010) ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material . . . ."); *Powers v. Ly-coming Engines*,

245 F.R.D. 226, 231 (E.D. Pa. 2007), *rev'd on other grounds*, 328 Fed. App'x 121 (3d Cir. 2009) ("Although there are numerous permutations of the elements of the [unjust enrichment] cause of action in the various states, there are few real differences."); *but see In re Flonase Antitrust Litig. ("In re Flonase II")*, 692 F. Supp. 2d 524, 541 (E.D. Pa. Jan. 21, 2010) ("The elements necessary to allege unjust enrichment vary state by state.").  The Court notes, however, that the cases cited by Indirect Purchaser Plaintiffs considered the law of unjust enrichment in the context of choice of law issues and not when analyzing claims under Rule 12(b)(6).[9]  The Court, finding the cases cited by Defendants to be persuasive, will therefore dismiss Indirect Purchaser Plaintiffs' unjust enrichment claim under Rule 12(b)(6) for failure to specify the particular state law under which Indirect Purchaser Plaintiffs intend to proceed.  Count Eight of the IPP Complaint is, therefore, dismissed.

C. *State Antitrust & Consumer Protection Law Claims – Counts 3-7 of the IPP Complaint & Counts 3-5 of the Indiana Complaint*

The remaining claims – Counts Three, Four, Five, Six, and Seven of the IPP Complaint and Counts Three, Four, and Five of the Indiana Complaint – allege violations of numerous state antitrust and consumer protection statutes.  Defendants contend that a number of these claims must be dismissed because Indirect Purchaser Plaintiffs and Indiana (1) lack standing to assert them and (2) have also failed to properly state a claim.  The Court now considers Defendants arguments concerning standing.

1. *Standing*

Standing is generally a "threshold inquiry" in any action.  *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998).  "[T]he constitutional and prudential requirements

---

[9] Furthermore, the other case cited by Indirect Purchaser Plaintiffs, *In re K-Dur Antitrust Litig.*, 339 F. Supp. 2d 517, 544 (D.N.J. Sept. 29, 2004), is not on point as the plaintiffs in that case apparently specified that they were proceeding under the laws of each of the fifty states.

of standing take on particular significance in the context of the antitrust laws, where a balance

must be struck between encouraging private actions and deterring legitimate competitive activity

through overly vigorous enforcement." *Id.* (citing *Capital Imaging Assoc. v. Mohawk Med.*

*Assoc.*, 996 F.2d 537, 539 (2d Cir. 1993)).

Under Article III of the United States Constitution, a federal court may decide "only

actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477

(1990). Thus, "Article III denied the District Court the power to decide questions that cannot

affect the rights of litigants before it, and confines it to resolving live controversies admitting of

specific relief through a decree of a conclusive character, as distinguished from an opinion

advising what the law would be upon a hypothetical state of facts." *Burkey v. Marberry*, 556

F.3d 142, 147 (3d Cir. 2009) (citing *Aetna Life Insur. Co. v. Haworth*, 300 U.S. 227, 241 (1937)

(citations omitted)). To satisfy the 'case or controversy' requirement, a plaintiff must show:

> (1) an injury-in-fact, which is an invasion of a legally protected interest that is (a)
> concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;
> (2) a causal connection between the injury and the conduct complained of; and (3) that it
> must be likely, as opposed to merely speculative, that the injury will be redressed by a
> favorable decision.

*Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007).

After determining that a party has satisfied the constitutional standing requirements, "the

court must make a further determination whether the plaintiff is the proper party to bring a

private antitrust action." *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 95 n.4

(3d Cir. 1986) (citing *Assoc. Gen. Contractors of California, Inc. v. California-State Council of*

*Carpenters*, 459 U.S. 519, 535 n.31 (1983)). This requirement that a plaintiff establish "antitrust

standing" is a "prudential, rather than constitutional limitation on the district court's

jurisdiction," *Shionogi Pharma, Inc. v. Mylan, Inc.*, No. 10-1077, 2011 WL 3860680, at *4 (D.

Del. Aug. 31, 2011), that "demands a much more detailed and focused inquiry into a plaintiff's

antitrust claims than constitutional standing," *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222, 224-

25 (2d Cir. 2008).

     The test for prudential limitations on claims arising under federal antitrust law is

explained in *Associated General Contractors of California, Inc. v. California State Council of*

*Carpenters* ("*AGC*"), 459 U.S. 519 (1983).  In that case, the Supreme Court identified five

factors for courts to weigh in determining whether a plaintiff has antitrust standing to bring a

private antitrust action under federal law:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and
> the intent by the defendant to cause that harm, with neither factor alone conferring
> standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust
> laws were intended to provide redress; (3) the directness of the injury, which addresses
> the concerns that liberal application of standing principles might produce speculative
> claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5)
> the potential for duplicative recovery or complex apportionment of damages.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 320 (3d Cir. 2007) (citing *Barton & Pittinos,*

*Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997)); *AGC*, 459 U.S. at 538-45.

     In applying these principles, the Supreme Court has held that indirect purchasers lack

standing to assert federal antitrust claims.  *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392

U.S. 481 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  The Supreme Court denied

standing to indirect purchasers in *Illinois Brick* due to concerns that such suits pose a risk of

double recovery and require a complex inquiry into the amount of the price increase that was

actually passed on to customers.  *Illinois Brick*, 431 U.S. at 730-32.  Therefore, "only

overcharged direct purchasers, and not subsequent indirect purchasers, are [generally] entitled to

recover . . . under [federal antitrust law]."  *See California v. ARC Am. Corp.*, 490 U.S. 93, 93

(1989) (citing *Illinois Brick*, 431 U.S. at 720).

Following the *Illinois Brick* decision, however, a number of states passed laws expressly permitting indirect purchasers to seek damages for injuries suffered as a result of anticompetitive behavior.  *See id*. at 98 n.3; *In re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023 (N.D. Cal. Mar. 30, 2010).  In *California v. ARC Am. Corp.*, the Supreme Court held that *Illinois Brick* does not prevent indirect purchasers from recovering damages under state antitrust statutes. *ARC Am. Corp.*, 490 U.S. at 105-06.  Claims brought in federal court under state antitrust statutes are subject to the state rules of antitrust standing, however.  *D.R. Ward Constr. Co. v. Rohm & Hass Co.*, 470 F. Supp. 2d 485, 496 (E.D. Pa. May 30, 2006) ("[T]he state rules of antitrust stating determine whether a plaintiff suing under a state antitrust statute enjoys federal prudential standing in a diversity action.").

Defendants advance a number of arguments to show that Indirect Purchaser Plaintiffs lack standing, which the Court now considers.

> #### a.  *State Law Claims Without a Named Indirect Purchaser Plaintiff*

Defendants contend that a number of Indirect Purchaser Plaintiffs' state law claims must be dismissed because Indirect Purchaser Plaintiffs lack standing to assert claims under the laws of any state but those in which they reside or were injured.  (IPP Action, Docket Entry No. 116, Attach. 1 at 6; IPP Action, Docket Entry No. 117, Attach. 1 at 14-19).  This issue arises because Indirect Purchaser Plaintiffs have asserted claims under the laws of 29 jurisdictions, yet they allege only that they were injured in their home states of Florida, Kansas, Michigan, Nebraska, New Hampshire, New York, North Carolina, and North Dakota.  Plaintiffs counter, however, that Defendants' argument is really about class certification, not standing, and is, therefore, premature.  (IPP Action, Docket Entry No. 122, Attach. 1 at 22-28).

"It is well-settled that a named plaintiff in a class action is required to establish Article III standing." *In re Magnesium Oxide Antitrust Litig.* ("*In re Magnesium Oxide I*"), No. 10-5943, 2011 WL 5008090, at *7 (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).  "Less well-settled is whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to Federal Rules of Procedure 23." *Id.* at *8.

A number of federal district courts have refused to dismiss claims brought under the laws of states in which no named plaintiff claims to have standing.  *See, e.g., Ramirez v. STI Prepaid LLC*, 644 F. Supp. 2d 496, 505 (D.N.J. Mar. 18, 2009).  Under this approach, "the fact that the named Plaintiffs may not have individual standing to allege violations of consumer protection laws in states other than those in which they [were injured] is immaterial" because "[t]he issue . . . is one of predominance – whether 'questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.*; *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06-1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006); *In re Busipirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. Feb. 14, 2002).

Other federal district courts, however, require that at least one plaintiff demonstrate standing for each claim asserted in the complaint prior to class certification.  *See, e.g., In re Magnesium Oxide I*, 2011 WL 5008090, at *7-10; *In re Packaged Ice Antitrust Litig.*, No. 08-1952, 2011 WL 891160, at *11 (E.D. Mich. Mar. 11, 2011) ("[N]amed plaintiffs lack standing to assert claims under the law of the states in which they do not reside or in which they suffered no injury."); *In re Terazosin Hydrochloride*, 160 F. Supp. 2d at 1371 ("[T]he named plaintiffs

cannot rely on unidentified persons within those states to state a claim for relief."); *Ulrich v. Walker*, No. 92-1078, 1992 WL 212478, at *1-2 (E.D. Pa. Aug. 28, 1992); *In re Refrigerant Compressors Antitrust Litig. ("In re Refrigerant Compressors I")*, No. 09-2042, 2012 WL 2917365, at *1 (E.D. Mich. July 17, 2012) ("[T]he named IP Plaintiffs lack constitutional standing to bring claims under the laws of states/territories where no named IP Plaintiff claims to reside or have been injured.").  After reviewing the different approaches, this Court agrees that named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.  In particular, the Court is persuaded by the reasoning of Judge Dickinson Debevoise in *In re Magnesium Oxide I*.  As Judge Debevoise explained,

> courts must initially 'review the standing of actual, not proposed plaintiffs' to assert the claims in a class action complaint because 'the alternative would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union.'

*In re Magnesium Oxide I*, 2011 WL 5008090, at *8 (citing *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 154-56 (E.D. Pa. 2009)).

Additionally, the Court is not persuaded by Indirect Purchaser Plaintiffs' argument in favor of deferring the standing issue until after class certification.  They argue that postponing decision on this issue is appropriate under two cases, *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), in which the Supreme Court resolved class certification issues prior to resolving Article III standing issues because the class certification issues were "logically antecedent to the existence of Article III issues . . . ." *Amchem*, 521 U.S. at 591-92.  As Judge Debevoise explained in *In re Magnesium Oxide I*, however, those cases

> stand [only] for the proposition that, in cases where a court is presented with class certification and Article III standing issues *simultaneously*, and the class certification

> issues are dispositive in that they pertain to statutory standing – i.e. whether a statute authorizes a given party to sue in the first place, the certification issues are 'logically antecedent' to the standing issues and the court may therefore elect to address the certification issues first in the interest of judicial restraint.

*In re Magnesium Oxide I*, 2011 WL 5008090, at *10 (emphasis added). Therefore, "a plaintiff must demonstrate standing for each claim he seeks to press" and *Amchem* and *Ortiz* do not permit a court to defer such analysis when class certification and standing issues are not presented simultaneously. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). The Court, therefore, dismisses Counts Three, Four, Five, Six, and Seven of the IPP Complaint to the extent they allege claims arising under the laws of Arizona, Arkansas, California, the District of Columbia, Hawaii, Iowa, Maine, Massachusetts, Minnesota, Mississippi, Nevada, New Mexico, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

### b.   Water Systems Project Contracts

Defendants also contend that five of the named Indirect Purchaser Plaintiffs – South Huntingdon, Woodridge, Fallsburg, Fargo, and Wayne County – and Indiana (collectively, "Water Systems Project Plaintiffs") lack standing because they purchased DIPF as part of a water systems project contract. (IPP Action, Docket Entry No. 116, Attach. 1 at 7-8; IPP Action, Docket Entry No. 117, Attach. 1 at 25-33; Indiana Action, Docket Entry No. 28, Attach. 1 at 4-5). Specifically, they contend that the allegations concerning Water Systems Project Plaintiffs' purchases are insufficient because they have not sufficiently alleged that they paid a higher price for water systems project contracts as a result of the conspiracy. (*Id*.).

### i.   Constitutional Standing

Defendants first argue that Water Systems Project Plaintiffs lack constitutional standing. (IPP Action, Docket Entry No. 116, Attach. 1 at 7; IPP Action, Docket Entry No. 117, Attach. 1

21

at 26-29; Indiana Action, Docket Entry No. 28, Attach. 1 at 4-5).  Specifically, Defendants contend that Water Systems Project Plaintiffs' allegations are insufficient to show that their injuries – the overcharges they allegedly paid – were proximately caused by Defendants' conduct.  (*Id*.).  They contend that the allegations fail to show that the alleged antitrust violations would have more than a "minimal foreseeable effect" on the price of the water systems project contract.  (*Id*.).

In advancing this argument, Defendants rely heavily on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982).  In that case, the Supreme Court explained that "[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy . . . ." *McCready*, 457 U.S. at 476-77.  "It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property" and, therefore, "there is a point beyond which the wrongdoer should not be held liable."  *Id*.  To determine whether a plaintiff has alleged that a defendant's alleged antitrust violation proximately caused an injury, courts therefore consider (1) "the physical and economic nexus between the alleged violation and the harm to the plaintiff;" and (2) "the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy . . . ."  *Id*. at 478.  The injury alleged must be "so integral an aspect of the conspiracy alleged [that] there can be no question but that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause."  *Id*. at 479 (internal quotations and citations omitted).

As a preliminary matter, *McCready* dealt with the issue of antitrust standing, not constitutional standing.  *See Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 9-10 (1st Cir. 1999)

(discussing *McCready* and explaining that "the Court has created a comprehensive antitrust standing doctrine to determine which persons are entitled to bring suit under the federal antitrust statutes"); *see also Franco v. Connecticut Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 836 (D.N.J. Sept. 23, 2011). Therefore, Defendants' argument is properly considered as part of Defendants' argument concerning antitrust standing.

Regardless, while Indirect Purchaser Plaintiffs admit that "DIPF are a relatively small portion of the cost of material of a typical waterworks project", (IPP Action, Docket Entry No. 110 at ¶ 116), the Court is not persuaded that this mandates dismissal under constitutional standing doctrine. Water Systems Project Plaintiffs allege that they purchased DIPF as part of water systems project contracts and paid inflated prices as a result of Defendants' alleged anticompetitive behavior. To require Water Systems Project Plaintiffs to provide allegations demonstrating how the price of DIPF affects the price of water systems project contracts at this time would require Water Systems Project Plaintiffs to satisfy burdens in their pleadings properly required only at the summary judgment stage. *See In re Auto. Parts Antitrust Litig.*, No. 12-2311, 2013 WL 2456612, at *8-9 (E.D. Mich. June 6, 2013) (rejecting the argument that "Indirect Purchaser Plaintiffs did not meet their pleadings burden because they do not include allegations as to whether an identifiable portion of the overcharges resulting from pricefixing was passed on at each step of the chain" and explaining that such arguments are generally considered at the class certification or the summary judgment stage); *Hyland v. Homeservices of Am., Inc.*, No. 05-612, 2008 WL 4000546, at *3 (W.D. Ky. Aug. 25, 2008). Furthermore, general economic principles suggest that indirect purchasers often suffer the greatest harm from illegal overcharges. *See, e.g.*, Robert G. Harris & Lawrence A. Sullivan, Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis, 128 U. Pa. L. Rev. 269, 276 (1979)

("[I]n a multiple-level chain of distribution, *passing on monopoly overcharges is not the exception: it is the rule*."); Antitrust Modernization Commission, Report and Recommendations, 256 (April 2007), *available at* http://www.amc.gov/report_recommendations/toc.htm ("[W]hen a price-fixing manufacturer overcharges for the goods it sells, the party who purchases the goods directly from that manufacturer pays the overcharge in the first instance.  This 'direct purchaser' then may incorporate the price-fixed good into the products it sells and pass on to its distributors all or some portion of the manufacturer's overcharge.  In turn, the distributors may be able to pass on all or a part of that overcharge to the consumers.").  As such, the Court is not persuaded that Indirect Purchaser Plaintiffs must provide allegations at the pleading stage regarding how the DIPF overcharges affected the overall price of the various water systems project contracts for constitutional standing purposes.

　　　　ii.　　Antitrust Standing

Defendants also contend that Water Systems Project Plaintiffs have failed to adequately allege antitrust standing.  (IPP Action, Docket Entry No. 116, Attach. 1 at 8; IPP Action, Docket Entry No. 117, Attach. 1 at 29-33; Indiana Action, Docket Entry No. 28, Attach. 1 at 5).  Specifically, Defendants contend that under state antitrust standing rules, Indirect Purchaser Plaintiffs and Indiana must satisfy the federal prudential standing test identified in *AGC* and that their pleadings are insufficient to satisfy that test.  (*Id*.).

　　　　a.　　Applicability of AGC Test to Water Systems Project Plaintiffs' State
　　　　　　　Law Claims

As previously explained, the prudential standing requirements for state antitrust claims asserted in federal court are governed by state law.  *D.R. Ward Constr. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 494 (E.D. Pa. May 30, 2006) ("[T]o determine whether a diversity plaintiff possesses federal prudential standing to bring a claim under a state antitrust statute,

[federal courts look] to the treatment of standing under the relevant state antitrust statutes."). "[B]ecause the concept of prudential standing in the antitrust context is intertwined with the substantive content of and intent behind the particular statute authorizing the cause of action, the standing requirements of [state] antitrust statutes, which recognize indirect purchaser claims, should be a guide for determining whether prudential considerations permit a plaintiff to sue under those statutes, as opposed to those requirements engrafted by federal case law onto federal antitrust statutes, which do not recognize indirect purchaser claims." *Id*. at 494-95 (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Therefore, "the Court must evaluate the standing limitations associated with each state antitrust statute." *Id*. at 496. This "requires an inquiry into the text of the relevant state antitrust statute, the judicial decisions determining who may sue under these statutes, including the treatment of federal precedent regarding standing for violations of the Sherman Act and the Clayton Act, and the reasoning behind these decisions." *Id*.

When deciding questions of state law, federal courts are bound by the decisions of the state's highest court. *Gares v. Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir. July 23, 1996). "In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *Id*. (citing *McKenna v. Pacific Rail Serv.*, 32 F.3d 820, 825 (3d Cir. 1994)); *Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991) ("An intermediate appellate state court . . . is datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise") (citations omitted).

Although Defendants concede that the *AGC* test does not apply to all state antitrust statutes,[10] they argue that it applies to all of the remaining claims asserted by the Water Systems Project Plaintiffs.  The Court, therefore, evaluates the provisions of the Michigan, Nebraska, New York, North Dakota, and Indiana antitrust laws under which Water Systems Contract Plaintiffs seek recovery.  First, the Court notes that Nebraska's highest court has held that the *AGC* factors apply to indirect purchaser claims under Nebraska antitrust law.  *Kanne v. Visa U.S.A., Inc.*, 272 Neb. 489, 498-501 (2006); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151 (N.D. Cal. Mar. 31, 2009); *In re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023 (N.D. Cal. Mar. 30, 2010); *In re Graphic Processing Units Antitrust Litig. ("In re GPU II")*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. Nov. 7, 2007).  As such, the Court concludes that the *AGC* factors apply to Indirect Purchaser Plaintiffs' claims under Nebraska antitrust law.

Additionally, the Court finds that the *AGC* factors apply to Water Systems Project Plaintiffs' claims under Michigan antitrust law as Michigan appellate courts have held that the *AGC* factors so apply.  *See Stark v. Visa, U.S.A. Inc.*, No. 03-55030, 2004 WL 1879003, at *2-4 (Mich. Cir. Ct. July 23, 2004); *see also In re Dynamic Random Access Memory Antitrust Litig. ("In re DRAM I")*, 516 F. Supp. 2d 1072, 1094 (N.D. Cal. June 1, 2007).  Indirect Purchaser Plaintiffs argue that a number of courts have declined to follow the reasoning of *In re DRAM I* and ask the Court to follow those cases.  However, the Court is not persuaded that the cases cited by Indirect Purchaser Plaintiffs are inconsistent with the Court's conclusion that the *AGC* factors apply to Michigan antitrust law.  In fact, the cases cited by Indirect Purchaser Plaintiffs merely reject the argument that the presence of a harmonization provision alone, absent some additional analysis of the state statutes, is sufficient to determine that the *AGC* factors apply.  *See In re*

---

[10] Defendants concede that *AGC* does not apply to claims brought under Minnesota and North Carolina law.  (*See* IPP Action, Docket Entry No. 177, Attach. 1, App'x II).

*Graphics Processing United Antitrust Litig. ("In re GPU I")*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. Sept. 27, 2007) ("It would be wrong for a district judge . . . to bypass all state legislatures and all state appellate courts and to pronounce a blanket and nationwide revision of all state antitrust laws. . . .  This order's rejection of the blanket nationwide proposal is without prejudice to a later state-by-state analysis of the extent to which [*AGC*] has actually been adopted by state officials."); *In re GPU II*, 540 F. Supp. 2d at 1097; *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1153 (N.D. Cal. Mar. 31, 2009) ("This Court . . . is reticent to adopt an across-the-board rule that a state's harmonization provision, whether created by statute or common law, is an appropriate means of predicting how a state's highest court would rule regarding the applicability of *AGC* to state law antitrust claims.").  A number of the cases also either declined to decide the issue or refused to apply the *AGC* factors to Michigan antitrust law because the parties had not sustained their burden by providing "the requisite, individualized analysis on a per state basis to enable the Court to render such a determination."  *In re Flash Memory*, 643 F. Supp. 2d at 1153; *see also In re Flat Panel*, 586 F. Supp. 2d at 1123 (not deciding whether the *AGC* factors apply to Michigan law because "even if the *AGC* test did apply, indirect plaintiffs in this case have alleged facts showing that they have standing under that test").

The Court is not persuaded that the *AGC* test applies to New York, North Dakota, or Indiana[11] antitrust law.  In reaching this conclusion, the Court notes that Defendants have not cited any state appellate cases to show that the highest court in those states would apply the *AGC* factors in those states.  As such, the Court will follow those cases in which the court "decline[d] to undertake the back-breaking labor involved in deciphering the state of antitrust standing in each of those states" where a party has not "show[n] that *AGC* has been adopted as the law of

---

[11] Only Star Pipe Products makes specific arguments regarding the applicability of the *AGC* test to Indiana antitrust law, contending that Indiana courts would likely apply the *AGC* test because Indiana antitrust law was patterned after the Sherman Act.  (Indiana Action, Docket Entry No. 28, Attach. 1 at 5).

those states." *See, e.g., In re GPU II*, 540 F. Supp. 2d at 1097; *In re Flash Memory*, 643 F. Supp. 2d at 1153.

> b. *Application of AGC Factors to Indirect Purchaser Plaintiffs' Nebraska and Michigan Claims*

As the *AGC* factors apply to Indirect Purchaser Plaintiffs' claims arising under Nebraska and Michigan antitrust law, the Court turns to whether Indirect Purchaser Plaintiffs have sufficiently demonstrated antitrust standing under the *AGC* test to be permitted to proceed with those claims. The Court, having assessed each factor individually, concludes that Indirect Purchaser Plaintiffs' Nebraska and Michigan antitrust claims should not be dismissed for lack of antitrust standing.

> i. *Causal Connection Between the Antitrust Violation and the Harm to the Plaintiff*

The first *AGC* factor is the causal connection between the antitrust violation and the harm to the plaintiff, and the intent by the defendant to cause that harm. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 320 (3d Cir. 2007) (citing *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997)). Here, Water Systems Project Plaintiffs allege that they purchased water system project contracts that included DIPF subject to Defendants' anticompetitive schemes and paid more for the water system project contracts as a result. The Court finds that these allegations are sufficient to show a causal connection between the alleged antitrust violation and the harm to Water System Project Plaintiffs. *See D.R. Ward Constr. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 502 (E.D. Pa. May 30, 2006) (finding that "a sufficient causal nexus exists between the injury and defendants' allegedly anticompetitive behavior" where plaintiffs alleged they "purchased and paid significantly more

for products containing plastic additives as a result of defendants' price-fixing conspiracy"). As such, the Court finds that this factor weighs in favor of standing.

*ii.  Type Intended to be Redressed*

The second *AGC* factor is whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress. *Broadcom Corp.*, 501 F.3d at 320 (citing *Barton & Pittinos*, 118 F.3d at 181). Courts typically agree that end users who pay inflated prices for a good suffer precisely the type of injury that antitrust laws seek to remedy. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000) (explaining that "[i]t is difficult to imagine a more formidable demonstration of antitrust injury" where consumers paid inflated prices for a medication subject to an anticompetitive scheme suffered antitrust injury, "[r]egardless of the existence of various links of middlemen").

Defendants contend, however, that Water Systems Project Plaintiffs are not participants in the relevant market. Specifically, they contend that Water Systems Project Plaintiffs participated only in the water systems project market, not the DIPF market. A number of courts have agreed that plaintiffs proceeding under a component theory of standing participate in a secondary market and, therefore, do not participate in the relevant market. *See, e.g., In re Dynamic Random Access Memory Antitrust Litig. ("In re DRAM II")*, 536 F. Supp. 2d 1129, 1137-38, 1141 (N.D. Cal. Jan. 29, 2008). A number of courts, however, have rejected this strict market participant test and permitted indirect purchasers to bring claims arising out of the purchase of finished products that incorporate parts subject to an anticompetitive scheme. *See In re Flat Panel*, 586 F. Supp. 2d at 491; *In re Auto. Parts Antitrust Litig.*, No. 12-2311, 2013 WL 2456612, at *15-16 (E.D. Mich. June 6, 2013); *In re Flash Memory*, 643 F. Supp. 2d at 1154 (finding that indirect purchasers of NAND flash memory that had been incorporated into finished

29

products were in the "same market" as direct purchasers who purchased NAND flash memory as a stand-alone item); *In re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023-24 (N.D. Cal. Mar. 30, 2010); *In re GPU II*, 540 F. Supp. 2d at 1098.  Additionally, some courts have recognized that "even if the plaintiffs were not participants in the relevant market, the [factor] still favored standing . . . because the plaintiffs had alleged that the products were identifiable, discrete physical objects that did not change form or become an indistinguishable part of the product in which they are contained, therefore they follow a traceable physical chain from the [manufacturers] to the purchasers of the finished products."  *In re Auto. Parts*, 2013 WL 2456612, at *15 (citations omitted); *see also In re GPU II*, 540 F. Supp. 2d at 1098.  Here, where Water Systems Project Plaintiffs have alleged that they purchased DIPF as a component of water systems project contracts and consequently paid a higher price for those contracts, the Court cannot say that they have not shown that they suffered injury of the type the antitrust laws are intended to redress for the purposes of their pleading requirements.

### iii.   Directness of the Injury

The third *AGC* factor is the directness of the plaintiff's injury.  *Broadcom Corp.*, 501 F.3d at 320 (citing *Barton & Pittinos*, 118 F.3d at 181).  A number of courts have held that "indirect purchasers of components had satisfied their burden of pleading directness of injury by alleging that the cost of the component was traceable through the product distribution chain."  *In re Flash Memory*, 643 F. Supp. 2d at 1155; *In re Flat Panel*, 586 F. Supp. 2d at 491; *In re GPU II*, 540 F. Supp. 2d at 1098.  As the Court finds Water Systems Project Plaintiffs' allegations sufficient to show that DIPF in water systems projects can be traced through the chain of distribution, the Court finds that this factor weighs in favor of standing.

#### iv.   Existence of More Direct Victims

The fourth *AGC* factor is the existence of more direct victims of the alleged antitrust

violations.  *Broadcom Corp.*, 501 F.3d at 320 (citing *Barton & Pittinos*, 118 F.3d at 181).  In this

case, there are clearly more direct victims as Defendants are subject to another action brought by

direct purchasers.  *See In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, No. 12-

711.  Additionally, there are indirect purchasers who purchased DIPF as a stand-alone product,

not as a component of a water systems project contract.  This factor, therefore, weighs in favor of

dismissal but does not alone mandate dismissal at this stage in the litigation.

#### v.   Potential for Duplicative Recovery or Complex Apportionment of Damages

The fifth *AGC* factor is the potential for duplicative recovery of complex apportionment

of damages.  *Broadcom Corp.*, 501 F.3d at 320 (citing *Barton & Pittinos*, 118 F.3d at 181).  The

potential for duplicative recovery exists in an indirect purchaser action, such as this, where a

direct purchaser class also seeks to recover damages.  However, where states have explicitly

rejected *Illinois Brick*, this Court is reluctant to undermine what the state legislatures have

condoned.  *See In re Auto. Parts*, 2013 WL 2456612, at *18; *In re Flash Memory*, 643 F. Supp.

2d at 1156 (citing *In re DRAM I*, 516 F. Supp. 2d at 1094) ("States . . . which have repealed

*Illinois Brick* and allowed indirect purchasers to sue for antitrust violations, have necessarily

made the policy decision that duplicative recovery may permissibly occur.  Duplicative recovery

is, in many if not all cases alleging a nationwide conspiracy with both direct and indirect

purchaser classes, a necessary consequence that flows from indirect purchaser recovery.

Accordingly, it is no bar against standing, and this factor does not weigh against standing."); *In

re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 410 (D. Del. July 12, 2007)

(explaining that the *AGC* factors that deal with directness, the existence of more direct victims,

and the potential for duplicative recovery or complex apportionment of damages "carry less weight in the standing analysis in jurisdictions rejecting *Illinois Brick*").  Furthermore, the Third Circuit has suggested that "while there will be some additional complications underlying the damage claims" in component cases, purchases of products containing restrained components do not bar antitrust claims.  *In re Linerboard Antitrust Litig. Winoff Indus., Inc.*, 305 F.3d 145, 159 (3d Cir. 2002).  Where, as here, Indirect Purchaser Plaintiffs and Indiana can trace overcharges through the distribution chain, the Court finds that this factor weighs in favor of standing.  *See In re Auto. Parts*, 2013 WL 2456612, at *18; *In re Flash Memory*, 643 F. Supp. 2d at 1155.

     *c.   Individual Injury*

     Defendants contend that six of the Indirect Purchaser Plaintiffs lack standing because they have failed to allege facts demonstrating that they themselves were injured.  (IPP Action, Docket Entry No. 117, Attach. 1 at 10-13; IPP Action, Docket Entry No. 116, Attach. 1 at 4-6). The Court previously dismissed Indirect Purchaser Plaintiffs' claims for failure to sufficiently plead individual injury.  (IPP Action, Docket Entry No. 105).  In that March 18 Opinion, the Court explained that

> in a class action lawsuit, a class representative for a particular claim must himself have a cause of action on that claim.  *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1169 (3d Cir. 1987).  'Each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to the claim.'  *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987).  Therefore, for each antitrust claim asserted, there must be at least one Indirect Purchaser Plaintiff who has experienced antitrust impact that flows from the anticompetitive behavior that gives rise to the claim.

(IPP Action, Docket Entry No. 105 at 7-8).  The Court explained that the allegations concerning Indirect Purchaser Plaintiffs' DIPF purchases were insufficient to show that they had actually purchased DIPF affected by the alleged anticompetitive scheme.  (*Id.*).  Specifically, Indirect Purchaser Plaintiffs' allegations were insufficient to show individual injury because it was not

clear from the Complaint that any Indirect Purchaser Plaintiff purchased affected DIPF during time periods relevant to the alleged conspiracies.  (*Id*.).

Defendants contend that under the Court's March 18 Opinion, the claims of six of the Indirect Purchaser Plaintiffs must again be dismissed for failure to allege individual injury.  First, Star Pipe Products argues that the claims asserted against it by Waterline in Counts Three and Four[12] of the IPP Complaint must be dismissed.  (IPP Action, Docket Entry No. 116, Attach. 1 at 4).  Specifically, Star Pipe Products contends that Waterline "alleges that it indirectly purchased DIPF in 2008 and 2009, but fails to allege that it purchased DIPF that originated from any Defendant."  (*Id*.).  While Indirect Purchaser Plaintiffs also allege that "Waterline indirectly purchased McWane-branded Domestic DIPF as a stand-alone product" in December 2009, the Court is not persuaded that these allegations are sufficient to demonstrate that Waterline purchased DIPF affected by the alleged price-fixing scheme.  (IPP Complaint, Docket Entry No. 110 at ¶ 17).  Therefore, Waterline's claims asserted under Counts Three and Four of the IPP Complaint are dismissed as to Star Pipe Products.

Second, Defendants contend that Blair has failed to allege individual injury.  (IPP Action, Docket Entry No. 116, Attach. 1 at 4; IPP Action, Docket Entry No. 117, Attach. 1 at 12).  Blair alleges that it "indirectly purchased DIPF as part of water systems projects in 2011 and 2012." (IPP Complaint, Docket Entry No. 110, at ¶ 27).  First, to the extent Blair seeks recovery for injury resulting from the price-fixing scheme that allegedly occurred in 2008 and 2009, the Court agrees that its claims must be dismissed as Blair has not alleged purchases of DIPF during the relevant time period.  Therefore, Counts Three and Four are dismissed to the extent they assert claims arising under Nebraska state law for the alleged price-fixing conspiracy.

_____

[12] Star Pipe Products also advances this argument in favor of dismissing Count Eight; however, as the Court has already determined that dismissal of Count Eight is appropriate on other grounds, the Court considers Star Pipe Products' arguments as they apply to Counts Three and Four only.

Additionally, Sigma and McWane argue that all remaining claims asserted by Blair must also be dismissed because, though Blair allegedly purchased DIPF during the relevant time period for the remaining claims, Blair did not specify whether it purchased domestically manufactured or imported DIPF.  (IPP Action, Docket Entry No. 117, Attach. 1 at 12).  The Court previously dismissed a number of Indirect Purchaser Plaintiffs' claims for this very reason. (IPP Action, Docket Entry No. 105 at 9-10).  As Indirect Purchaser Plaintiffs' allegations regarding Blair's purchases are in some ways less detailed in the IPP Complaint than they were in the Amended Complaint, the Court finds dismissal of Blair's claims is required.  (*Compare* IPP Action, Docket Entry No. 85 at ¶ 19 (stating that "Blair indirectly purchased DIPF that was originally imported, marketed or sold by one or more of the Defendants as part of a water systems contract"), *with* IPP Action, Docket Entry No. 110 at ¶ 27 (stating that "Blair indirectly purchased DIPF as part of water systems project contracts in 2011 and 2012")).  Blair simply may not proceed with its claims absent some showing that it has been injured by Defendants' allegedly anticompetitive conduct.

Third, Defendants argue that any claims brought by Woodridge that relate to the alleged price-fixing scheme must be dismissed because Woodbridge is not alleged to have purchased DIPF during that conspiracy and, therefore, could not have been impacted by it.  (IPP Action, Docket Entry No. 116, Attach. 1 at 5; Docket Entry No. 117, Attach. 1 at 22 n.7).  This Court agrees.  According to Indirect Purchaser Plaintiffs, Woodridge indirectly purchased domestic DIPF from Sigma and Star Pipe Products in 2010 and 2011, (IPP Action, Docket Entry No. 110 at ¶ 38), however, the IPP Complaint alleges that Star Pipe Product's participation in the alleged anticompetitive behavior was confined to the time period beginning in January 11, 2008 and ending in May 2009.  (*Id*. at ¶ 54).  As Counts Three and Four relate only to conduct that

occurred between January 11, 2008 and May 2009, (*id*. at ¶¶ 156, 188), Woodridge has failed to allege individual injury with regards to Counts Three and Four and those claims are, therefore dismissed as to Woodbridge.

Fourth, Defendants contend that Fallsburg has failed to allege individual injury. (IPP Action, Docket Entry No. 116, Attach. 1 at 5; IPP Action, Docket Entry No. 117, Attach. 1 at 13). The Court agrees. In the IPP Complaint, Indirect Purchaser Plaintiffs allege that "[b]etween 2010 and 2011, [Fallsburg] indirectly purchased Star [Pipe Products]-branded Domestic DIPF as part of multiple water systems project contracts." (IPP Complaint, Docket Entry No. 110 at ¶ 42). The only allegations of anticompetitive behavior on the part of Star Pipe Products, however, are confined to the price-fixing scheme of 2008 and 2009. (*Id*. at ¶¶ 54-76). Fallsburg has, therefore, failed to allege individual injury and its claims are dismissed.

Fifth, Star Pipe Products argues that the claims brought by Johnson County against Star Pipe Products must be dismissed. (IPP Action, Docket Entry No. 116, Attach. 1 at 5). In support of this argument, Star Pipe Products contends that Johnson County "alleges only purchases of *domestic* DIPF from April 2008 through December 2009" but not *imported* DIPF – "the subject of the alleged 2008-2009 conspiracy." (*Id*.). Having reviewed the IPP Complaint, however, the Court finds nothing to support Star Pipe Products' contention that the 2008-2009 conspiracy was limited to *imported* DIPF. Instead, the IPP Complaint repeatedly states that Defendants conspired to fix prices "at which DIPF were sold in the United States." (IPP Complaint, Docket Entry No. 110 at ¶¶ 54, 60, 156). As such, to the extent Star Pipe Products seeks dismissal of Johnson County's claims for failure to allege individual injury, such relief is denied.

Finally, Defendants contend that Fargo has failed to allege individual injury. (IPP Action, Docket Entry No. 116, Attach. 1 at 5; IPP Action, Docket Entry No. 117, Attach. 1 at 12-

13).  Indirect Purchaser Plaintiffs' allegations state only that between 2008 and the present,

"Fargo indirectly purchased DIPF that was originally manufactured by one or more of the

Defendants as part of many water systems project contracts," and "[o]n information and belief,

between February 17, 2009 and the present, Fargo indirectly purchased McWane-branded

Domestic DIPF as part of a water systems project contract."  (IPP Complaint, Docket Entry No.

110 at ¶¶ 33, 34).  The Court finds these allegations insufficient to show that Fargo was injured

by either the alleged price-fixing or monopolization schemes.  As such, Fargo's claims are

dismissed.

### 2.  *Failure to State a Claim*

Defendants argue that a number of Indirect Purchaser Plaintiffs' claims must be

dismissed for failure to state a claim under the statutory requirements of the various state laws.

(IPP Action, Docket Entry No. 116, Attach. 1 at 10-13; IPP Action, Docket Entry No. 117,

Attach. 1 at 19-21).

### 1.  *Florida Antitrust Act*

First, Defendants contend that Indirect Purchaser Plaintiffs' claim under the Florida

Antitrust Act, §§ 542.19, *et seq.*, (IPP Action, Docket Entry No. 110 at ¶ 258), must be dismissed

for failure to state a claim.  (IPP Action, Docket Entry No. 117, Attach. 1 at 21).  The Court

agrees.  "Florida's Antitrust Act prohibits indirect purchaser standing." *California v. Infineon

Techs. AG*, 531 F. Supp. 2d 1124, 1144 (N.D. Cal. 2007) (citing *Mack v. Bristol-Myers Squibb

Co.*, 673 So. 2d 100, 103 (Fla. Dist. Ct. App. 1996)).  Furthermore, it appears that Indirect

Purchaser Plaintiffs do not contest this argument as it is not addressed in their brief.  (*See* IPP

Action, Docket Entry No. 122, Attach. 1).  Therefore, Count Seven of the IPP Complaint is

dismissed to the extent it alleges a violation of Florida statutes, §§ 542.19, *et seq*.

2.  *Michigan, New York, and North Carolina Antitrust Laws & North Carolina and New Hampshire Consumer Protection Laws*

Defendants also argue that Indirect Purchaser Plaintiffs' claims arising under the antitrust statutes of Michigan, New York, and North Carolina and the consumer protection statutes of North Carolina and New Hampshire must be dismissed because those statutes require and Indirect Purchaser Plaintiffs have failed to plead a concrete connection between the alleged conduct and the state.  (IPP Action, Docket Entry No. 117, Attach. 1 at 19-20).  The Court, however, is not persuaded that dismissal is warranted at this time.  The cases cited by Defendants in favor of dismissal under Michigan and New York antitrust laws do not appear to go so far as to require such local or intrastate conduct.  *See, e.g., Sheet Metal Workers Local 441 Health & Welfare Plan v. Glaxosmithkline, PLC*, 737 F. Supp. 2d 380, 396 (E.D. Pa. Sept. 7, 2010) ("*Peoples Savings Bank* simply observed that the monopolistic activities in question *in that case* were predominantly local . . . .  The court did *not* rule that the [Michigan antitrust statute] *only* applies to activities that are predominantly local"); *Bowlus v. Alexander & Alexander Servs., Inc.*, 659 F. Supp. 914 (S.D.N.Y. May 12, 1987) (discussing New York antitrust law's "in state" requirement in the context of removal and preemption, not pleading requirements).  Furthermore, courts interpreting New Hampshire's consumer protection law disagree as to whether a nationwide scheme in which the plaintiffs pay a higher price in the state is sufficient to satisfy the statute's requirement.  *See In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 234-35 (M.D. Pa. Sept. 21, 2010) ("The . . . complaint avers that defendants colluded to fix the price of chocolate products that were then introduced into the New Hampshire market [which], at the very least, had indirect effects on the New Hampshire market and its residents."); *but see In re Refrigerant Compressors II*, No. 09-2042, 2013 WL 1431756, at *17-18 (E.D. Mich. Apr. 9, 2013) (dismissing claim under New Hampshire's consumer protection statute for

failure to allege that any unfair or deceptive act or practice took place in New Hampshire where the plaintiff alleged only that he resides in and made a purchase in New Hampshire). Finally, the cases cited by Defendants in favor of dismissal of claims under North Carolina's antitrust and consumer protection statutes are distinguishable as plaintiffs in that case did not market or sell their product in the state of North Carolina. *See In re Refrigerant Compressors II*, 2013 WL 1431756, at \*19. As such, Defendants have not shown that dismissal is warranted on this basis under Rule 12(b)(6).

### 3. *Florida Consumer Protection Law*

Star Pipe Products argues that Indirect Purchaser Plaintiffs' claims arising under Florida's consumer protection statute should be dismissed for failure to state a claim. (IPP Action, Docket Entry No. 116, Attach. 1 at 11-13). McWane and Sigma do not challenge the sufficiency of Indirect Purchaser Plaintiffs' pleadings with regards to their claims under Florida consumer protection law. (IPP Action, Docket Entry No. 117, Attach. 1 at 10 n.5). Having reviewed the IPP Complaint, the Court is not persuaded that Plaintiffs have failed to plead an "unfair method of competition" sufficient for pleading purposes. *In re Pool Prods. Distribution Market Antitrust Litig.*, No. MDL 2328, 2013 WL 2297213, at \*10-11 (E.D. La. May 24, 2013).

### 4. *Count 3 of the Indiana Complaint*

Finally, Star Pipe Products argues that Indiana's third claim for relief should be dismissed as to Star Pipe Products with regards to any allegations after May 2009 because Indiana has failed to allege facts to demonstrate anything other than parallel conduct after May 2009. (Indiana Action, Docket Entry No. 28, Attach. 1 at 5-7). The Court disagrees that dismissal is warranted on this basis. As explained in *Bell Atlantic Corp. v. Twombly*, when a plaintiff alleges parallel conduct, the allegations "must be placed in a context that raises a suggestion of a

preceding agreement.  550 U.S. 544, 557 (2007).  The plaintiff must, therefore, allege "plus factors" which may include "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; (3) and evidence implying a traditional conspiracy."  *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321-22 (3d Cir. 2010) (internal quotations omitted).  In the corresponding direct purchaser action, this Court held that Direct Purchaser Plaintiffs' allegations concerning Defendants' conduct between January 2008 and May 2009 were sufficient to satisfy the pleading requirements under *Twombly* because the parallel conduct occurred in a context that raises a suggestion of a preceding agreement.  *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, No. 12-711, 2013 WL 812143, at *10-13 (D.N.J. Mar. 5, 2013).  The Indiana Complaint contains virtually identical allegations, however, Indiana also alleges that Star Pipe Products announced a price increase in June 2010 that prompted Sigma and McWane to also increase prices.  (Indiana Complaint, Docket Entry No. 22 at ¶¶ 63-71).  As the allegations concerning the alleged price-fixing conspiracy between January 2008 and May 2009 are sufficient to satisfy the pleading requirements under *Twombly*, the Court is not persuaded that subsequent parallel conduct is insufficient under 12(b)(6).  Indiana alleges that Defendants entered into an agreement to fix prices that was maintained through corresponding parallel price increases through June 2010.  The Court agrees with Indiana that these allegations are sufficient to demonstrate parallel conduct arising in a context that raises a suggestion of a preceding agreement.  To the extent Star Pipe Products seeks to dismiss Count Three for failure to allege more than parallel conduct, Star Pipe Product's motion is denied.

IV.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss are granted in part and denied

in part.  An appropriate order will follow.


<u>/s/ Anne E. Thompson</u>
ANNE E. THOMPSON, U.S.D.J.


Date:   October 2, 2013